**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ZACHARY MARSHALL,<br><br>Defendant. | Criminal No. 1:23-cr-10127-LTS |

### DEFENDANT ZACHARY MARSHALL'S SENTENCING MEMORANDUM

Defendant Zachary Marshall, by and through his undersigned counsel, hereby submits the following Sentencing Memorandum in connection with the sentencing proceeding in this matter currently scheduled for Wednesday, April 10, 2024, at 3:00 p.m. As explained in greater detail below, Mr. Marshall respectfully submits that, after consideration of all the factors under 18 U.S.C. § 3553(a), a sentence of **37 months**, plus an additional three-year period of supervised release, would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

Mr. Marshall further requests that this Court recommend that he be assigned to a facility where he can participate in an intensive, 500-hour drug treatment program that offers him a full range of substance abuse and other counselling. *See* Presentence Report ("PSR) ¶ 310. Admission to such a program would provide him with a greater ability to address his significant personal challenges and to return to his family with a chance to lead a productive and healthy life after his release from incarceration.

1

## MR. MARSHALL'S PERSONAL HISTORY

Mr. Marshall's personal background is summarized in the PSR. *See* PSR ¶¶ 284-323. Born in 1997 in Springfield, Massachusetts, he was raised by both of his parents until their divorce when he was about thirteen years old, after which he was raised by his mother. *Id.* ¶¶ 285, 287. His family struggled financially, and those financial difficulties were exacerbated after his parents' divorce. *Id.* ¶ 286. Both of his parents, as well as one of his siblings, also struggled with substance abuse. *Id.* ¶¶ 285-286. As a result, Mr. Marshall was often left to care for himself. *Id.* ¶ 285.

Although Mr. Marshall was not particularly close with his parents during his childhood, he has become very close with his mother as an adult and now maintains a supportive and friendly relationship with his father. *Id.* ¶ 285. Before his arrest, Mr. Marshall was devoting substantial time and energy to supporting his mother through various surgeries, and his mother has been particularly supportive of him during his current detention in connection with this case. *Id.* ¶¶ 285, 288. He is also close with his sister, Alisha Marshall. *Id.* ¶ 285.

The collection of letters provided to the Court demonstrates the powerful love and support that Mr. Marshall's family offers and provide some insight into his character. *See* Defendant's Letters of Support (filed concurrently). Mr. Marshall's mother describes him as a kind and caring young man who puts the needs of others first and who "stayed by [her] side" and took care of her when she had to undergo several surgeries. *Id.* at Ex. A. His sister talks about his "incredible heart" and the way that he "owns up to his mistakes" and uses them as an opportunity to learn and grow. *Id.* at Ex. B. His father likewise discusses Mr. Marshall's "good heart" and the fact that Mr. Marshall deeply regrets and has learned from his mistakes. *Id.* at Ex. C.

Mr. Marshall has three children, aged seven, six, and two. *Id.* ¶¶ 289-292. Prior to his incarceration, he was residing in a four-bedroom house in which each of his children had their own bedroom, and he saw and cared for each of them multiple times per week. *Id.* ¶ 293. Mr. Marshall would also frequently travel to Connecticut to care for his daughter, when her mother, Katelyn Hernandez, needed childcare due to work obligations. Mr. Marshall maintains close relationships with Ms. Hernandez as well as Jada-Lynn Zayas, who is the mother of his youngest son and with whom he was in a relationship until his arrest in this case. *Id.* ¶ 291-292.

The letters submitted in support of Mr. Marshall attest to his deep devotion to his three children. They discuss the "bond that is so special" between Mr. Marshall and his children, *id.* at Ex. A, and his "strong commitment" to ensuring that they have everything they need, *id.* at Ex. C, Ex. F. Mr. Marshall's seven-year-old son also writes about how much he misses seeing and spending time with his father. *Id.* at Ex. D.

In December 2021, Mr. Marshall was shot multiple times in the abdomen while walking outside of a nightclub. *Id.* ¶ 297. He suffered devastating injuries that required extensive abdominal surgery. *Id.* Since that time, he has experienced chronic nerve pain, chronic back pain, and other health problems, as well as anxiety, depression, and post-traumatic stress disorder stemming from the shooting. *Id.* ¶¶ 297, 300. While Mr. Marshall was ultimately able to recover from the physical injuries resulting from the shooting, that experience had an enormous adverse effect on his ability to work, as he can no longer sit or stand for long periods of time without experiencing significant pain. *Id.* ¶ 297. Mr. Marshall also has a history of problematic substance use, including both alcohol and, more recently, prescription opioids, *id.* ¶¶ 304-310, and he has struggled with problematic gambling since the age of 21, *id.* ¶¶ 302-303. Mr. Marshall has expressed interest in receiving treatment for these issues. *Id.* ¶¶ 300-301, 308, 310. In 2022, he

3

signed a voluntary self-exclusion form with the Massachusetts Gaming Commission to help address his problematic gambling. *Id.* ¶ 302. And he has also sought therapy for his mental health and substance use issues. *Id.* ¶¶ 300-301.

There is little doubt that Mr. Mashall's current legal situation has been personally devastating for him and his family. However, he has responded to his detention with introspection and an eye towards changes that he can make upon his release. While at Wyatt, he has devoted a substantial amount of time to participating in the educational and social programs offered to detainees. *Id.* ¶ 4 (listing multiple education programs that Mr. Marshall has completed while at Wyatt). And in recognition of the harms that he inflicted in connection with the underlying offense, he has been participating in an inmate-run restorative justice program to better understand the impact of his conduct on the people impacted and to take responsibility for his actions. *Id.*

Mr. Marshall has considerable support in the community from his family and friends, and these supporters all express confidence that, after his eventual release, Mr. Marshall will be able to rebuild his life and become a productive member of society. *See* Letters of Support. As discussed above, Mr. Marshall's parents and sister all write that Mr. Marshall has accepted responsibility for his actions, and they believe he has learned, and will continue to learn, from his mistakes. *Id.* at Ex. A-C. Mr. Marshall's friends likewise share that Mr. Marshall is "genuinely remorseful for his actions," *id.* at Ex. F, and that he has "a lot of positive support to guide him on the right path," *id.* at Ex. G. Pastor Gene Pelkey, who met with Mr. Marshall at church events, also expresses confidence that "once this is all behind him, he will get his life in order" with the support of his family and community. *Id.* at Ex. H. With all this support from his community, as well as the support of the Probation Office during his period of supervised release, Mr. Marshall

4

is well-positioned to successfully begin the process of re-integrating into society and becoming a productive and responsible citizen.

## THE OFFENSE CONDUCT

Mr. Marshall has pleaded guilty to participating in the conspiracy charged in the indictment to transport stolen property valued over $5,000 in interstate commerce, as well as a separate count of interstate transportation of stolen property valued over $5,000. *Id.* ¶ 5. As detailed in the PSR, the overall conspiracy involved the theft of catalytic converters over a period of approximately eleven months, from March 7, 2022, until April 11, 2023. *Id.* ¶¶ 18, 58. Mr. Marshall participated in the conspiracy when he joined defendant Rafael Davila in engaging in a series of catalytic converter thefts between January 2023 and April 2023. *Id.* ¶¶ 45-47. In addition, on February 2, 2023, he participated with Mr. Davila in a burglary of a storage unit and the theft of some tools and other items. *Id.* ¶ 207.[1]

On November 14, 2023, during his plea hearing, Mr. Marshall acknowledged participating in the following catalytic converter thefts:

| Date | Location | Identified Number of Vehicles Stolen From |
|---|---|---|
| 1/19/2023 | Fitchburg, MA | 8 |
|  | Leominster, MA | 1 |
| 1/31/2023 | Shrewsbury, MA | 16 |
| 2/9/2023 | Wilmington, MA | 1 |
|  | Woburn, MA | 13 |
| 2/16/2023 | Marlborough, MA | 1 |
|  | Northborough, MA | 4 |

---

[1] Defendant notes that, in addition to the objections referenced in the Addendum to the PSR, he also asserted timely objections to Paragraphs 6-9, 11, 15-16, 31-37, 41-44, 48-54, 58, 59-70, 94-99, 107-206, 215-234, 238-239, 241-245, and 247, largely on the basis that those paragraphs, or portions thereof, include information not material to the issues to be resolved by the Court at sentencing or contain information beyond the scope of his knowledge. Although not referenced or addressed by Probation in the final PSR, Defendant respectfully reserves his objections to these paragraphs to the extent the Court may seek to rely on any portions of those paragraphs in connection with his sentencing.

| Date | Location | Count |
|---|---|---|
| 2/28/2023 | Auburn, MA | 2 |
|  | Millbury, MA | 7 |
| 3/7/2023 | Wilmington, MA | 3 |
|  | Woburn, MA | 2 |
|  | Hudson, MA | 1 |
|  | Burlington, MA | 4 |
| 3/9/2023 | Auburn, MA | 3 |
|  | Bedford, MA | 2 |
|  | Billerica, MA | 4 |
| 3/16/2023 | Sterling, MA | 20 |
| 3/21/2023 | Leominster, MA | 13 |
| 4/6/2023 | Northbridge, MA | 1 |
|  | Worcester, MA | 1 |
|  | **TOTAL** | **107** |

*See* Plea Facts, ECF No. 143, ¶ 10. During his plea, Mr. Marshall also acknowledged that he had participated in the theft of approximately $13,000 worth of tools and merchandise from a storage unit on February 2, 2023. *Id.* ¶ 67.

The government has agreed that at $5,000 per vehicle, the loss attributable to Mr. Marshall's catalytic converter thefts was $535,000, for a total loss amount of $548,000, including the stolen tools. *See* Plea Agreement, ECF No. 134, at 2 (taking the position that the loss amount attributable to Mr. Marshall is greater than $250,000 but less than $550,000). The PSR, however, attributes 113 vehicle thefts to Mr. Marshall, adding six additional thefts in Mansfield, MA on April 6, 2023, to those included above. *See* PSR ¶¶ 58,[2] 100, 102, 105-106. The inclusion of these additional thefts would increase the loss attributable to the catalytic converter thefts to $565,000, for a total loss of $578,000. *Id.* ¶¶ 240, 254.

---

[2] Although not referenced in the Final PSR, Mr. Marshall specifically objected to Paragraph 58 insofar as it attributed 113 thefts to him, rather than the 107 thefts addressed during his plea hearing and reflected in his plea agreement.

## PROCEDURAL HISTORY

On April 6, 2023, Mr. Marshall was charged in a criminal complaint with conspiracy to transport stolen property valued over $5,000 in interstate commerce and interstate transportation of stolen property valued over $5,000. *See* Complaint, ECF No. 4. Mr. Marshall was arrested on those charges on April 12, 2023, and he has remained in federal custody at Wyatt Detention Center in Central Falls, RI ever since. *See* PSR ¶ 1.

On May 3, 2023, Mr. Marshall was named in two counts of a thirteen-count indictment charging him and five co-defendants with, among other things, participating in a conspiracy to transport stolen property valued over $5,000 in interstate commerce and other federal offenses. *Id.* ¶ 5. Mr. Marshall was named in count 1 (conspiracy to transport stolen property valued over $5,000 in interstate commerce) and count 5 (interstate transportation of stolen property valued over $5,000). *Id.*

On November 14, 2023, Mr. Marshall pleaded guilty to counts 1 and 5 of the indictment. *Id.* ¶¶ 2, 5. His sentencing is currently scheduled for April 10, 2024, at 3:00 p.m.

## THE SENTENCING GUIDELINES

The Probation Office calculates Mr. Marshall's offense level by using U.S.S.G. § 2B1.1, the guideline applicable to offenses involving stolen property. *See* PSR ¶ 253. Under § 2B1.1(a)(2), Mr. Marshall's base offense level is 6. *Id.* For a loss of more than $250,000 but less than $550,000, 12 points are added; for a loss of more than $550,000 but less than $1,500,000, 14 points are added. *See* U.S.S.G. § 2B1.1(b)(1). *Id.*

In this case, the Probation Office concludes that the loss amount was $565,000 from the catalytic converters based on 113 vehicle thefts, plus $13,000 from the storage unit theft, for a total of $578,000. *See* PSR ¶ 254. Accordingly, the Probation Office increases Mr. Marshall's

offense level by 14 points. *Id.* The Probation Office further increases his offense level by 2 points because the offense involved 10 or more victims and another 2 points because the offense involved an organized scheme to steal or receive vehicles or vehicle parts. *Id.* ¶¶ 255-256.[3] Based on these adjustments, the Probation Office calculates an adjusted offense level of **24**. *Id.* ¶ 260. After a three-point reduction for acceptance of responsibility, the Probation Office concludes that Mr. Marshall's total offense level is **21**. *Id.* ¶ 264. With a criminal history category of III, *id.* ¶¶ 270-272, that calculation results in a guideline imprisonment range of **46 to 57 months**, *id.* ¶ 325.

As noted above, Mr. Marshall contends that he is responsible for 107 catalytic convert thefts, not the 113 calculated by the Probation Office. *See* PSR at 96, Defendant's Objections #1-#3. He accordingly contends the offense level should be increased by 12 points rather than 14 based on a loss amount of $548,000. This would reduce his total offense level to **19**. With a criminal history category of III, that calculation would result in a guideline imprisonment range of **37 to 46 months**.

## ARGUMENT

**A.     The Court should not find Mr. Marshall responsible for a loss amount greater than $550,000.**

As discussed above and as set forth in his objections to the PSR, Mr. Marshall contends that on November 14, 2023, he admitted to participating in catalytic converter thefts from 107 vehicles. *See* Plea Facts, ECF No. 143, ¶ 10. At a $5,000 estimated loss per vehicle, that amounts to a $535,000 loss attributable to the catalytic converter thefts attributable to Mr. Marshall. Mr. Marshall also admitted to participating in the theft of approximately $13,000 worth of tools and merchandise from a storage unit on February 2, 2023, raising the total loss amount for the

---

[3] Mr. Marshall does not object to the applicability of these two enhancements.

conduct to which he admitted during his guilty plea to $548,000. Consistent with that calculation, in the plea agreement in this case, the government agreed that the loss amount applicable to Mr. Marshall in this case is more than $250,000 but less than $550,000, leading to a 12-point increase to the base offense level. *See* Plea Agreement, ECF No. 134, at 2. As explained above, attribution of that conduct to Mr. Marshall would result in a total offense level of **19** and a guideline imprisonment range of **37 to 46 months**.

Consistent with the foregoing, Mr. Marshall has objected to the Probation Office's inclusion of six additional thefts in Mansfield. *See* PSR at 96, Defendant's Objections #1-#3; *see also* PSR, Defendant's Objections #4-9 (preserving same objections as it affects guideline calculations). In response to these objections, the Probation Office argues that "[t]he defendant provides no explanation as to why he objects to the six alleged thefts in Mansfield." *Id.* at 96 (Probation Officer's Response to Objection's #1-#3).

But of course it is the government's burden, *not* the defendant's, to "prove the amount of loss by a preponderance of the evidence." *United States v. Flete-Garcia*, 925 F.3d 17, 28 (1st Cir. 2019). Here, the government has informed the Probation Office that it does not intend to offer any proof relating the Mansfield thefts at Mr. Marshall's sentencing. *See* PSR at 96. In the absence of such proof, there is no basis to conclude that losses from these additional thefts should be attributable to Mr. Marshall. Accordingly, Mr. Marshall submits that this Court should decline to adopt the Probation Office's conclusions regarding the loss amount stemming from these additional thefts and instead find that the loss attributable to Mr. Marshall in this case is between $250,000 and $550,000.

### B. The Court should not impose the sophisticated means enhancement requested by the government.

In its objections to the PSR, the government contends that Mr. Marshall's base offense level should be increased by two additional points pursuant to U.S.S.G. § 2B1.1(b)(10)(C) on the grounds that "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." *See* PSR at 92-96, Government Objection #2. The Court should decline to impose that enhancement in this case.

As noted above, "[t]he government bears the burden of proving a sentencing enhancement by a preponderance of the evidence." *United States v. Newton*, 972 F.3d 18, 20 (1st Cir. 2020). With respect to the "sophisticated means" enhancement, the government must prove not merely that the offense as a whole was "especially complex" or involved "especially intricate offense conduct pertaining to the execution or concealment of an offense," *see* U.S.S.G. § 2B1.1, cmt. 9(B), but also that "*the defendant intentionally engaged in or caused the conduct constituting sophisticated means*," U.S.S.G. § 2B1.1(b)(10)(C) (emphasis added). This is because "basing the enhancement on the defendant's own intentional conduct better reflects the defendant's culpability and . . . minimize[s] application of this enhancement to less culpable offenders." *See* U.S.S.G. App. C., Supplement at 113 (discussing reason for 2015 amendment to "sophisticated means" enhancement).

Here, the government contends that the scheme was "sophisticated" because the defendants "used an anonymized vehicle" equipped with "anonymized license plates"; spread the thefts "across jurisdictions to avoid police interdiction and reduce the potential for coordinated investigation"; planned their thefts to target multiple vehicles at once; researched the most valuable vehicles to target and spent effort doing "homework" to identify where they would be found; made use of an internet application that provided real-time pricing for catalytic

10

converters; and were skilled at quickly removing catalytic converters. *See* PSR at 93-94. But while these factors may demonstrate that the overall scheme was somewhat complex, they do not reflect any "sophistication" vis-à-vis Mr. Marshall's specific conduct.

Here, as the Probation Office has acknowledged, Mr. Marshall did not act as the leader of the conspiracy. He did not plan or otherwise manage the logistics of the thefts. *See* PSR at 95. He also was not involved in the creation of a shell corporation to facilitate any transactions with buyers. *Id.* To the contrary, Mr. Marshall's involvement in the scheme largely entailed accompanying Mr. Davila during thefts and acting as a "cutter" to remove the catalytic converters from the vehicles targeted by Mr. Davila. As the Probation Office has explained in its response to the government's objections—and as this Court separately concluded during the recent sentencing of Mr. Marshall's co-defendant, Nicholas Davila—such conduct is not of the "especially complex" or "especially intricate" nature contemplated by the "sophisticated means" enhancement. *See* PSR at 95. The Court should accordingly decline to impose the "sophisticated means" enhancement requested by the government here.

    **C.**    **The Court should not impose the reckless endangerment enhancement requested by the government.**

The government separately contends that Mr. Marshall's base offense level should be increased by two additional points pursuant to U.S.S.G. § 3C1.2 on the grounds that "the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." *See* PSR at 90-91, Government Objection #1. Here, the government contends that three high-speed chases—on March 7, 2023, April 6, 2023, and February 2, 2024—involving Mr. Davila's Acura MDX provide the factual basis for applying the enhancement. *See* PSR at 91 (citing PSR ¶¶ 85, 101-103, 207-210). This Court should decline to impose that enhancement in this case.

As a threshold matter, Mr. Marshall contends that the conduct described by the government does not meet the standard for "reckless endangerment" that is required for a two-level enhancement pursuant to § 3C1.2. As the Probation Office notes, the February 2, 2023 chase occurred "during the overnight hours at 2:11 a.m. on the highway before officers terminated pursuit," and "[n]otwithstanding the evasive driving and high speeds, there was no other evidence of a substantial risk to others given the time of day and the areas travelled." PSR at 91. Similarly, the March 7, 2023 chase "occurred during the overnight hours at 3:05 a.m., and police discontinued the pursuit when the Acura MDX got onto the highway" and "[n]otwithstanding the one vehicle that was cut off and the high speeds, there is no other evidence of a substantial risk to others given the time of day and the areas travelled." Finally, the April 6, 2023, chase was "brief, occurred during the overnight hours," and there was no evidence of substantial risk to others. By contrast, in the cases cited by the government in support of the enhancement, the high-speed chases took place "on small back roads in the early evening, in a residential neighborhood in which one could assume that people might be out and about," *United States v. Carrero-Hernandez*, 643 F.3d 344, 347 (1st Cir. 2011); at 4 p.m. "near a local university" in "an active business area near several restaurants, fast-food spots, bars, and a clinical laboratory" and "only ended when [the defendant] rammed his car into another vehicle," *United States v. Vega-Rivera*, 866 F.3d 14, 19 (1st Cir. 2017); and at high speeds through residential neighborhoods, *see United States v. Jimenez*, 323 F.3d 320, 324 (5th Cir. 2003); *United States v. Velasquez*, 67 F.3d 650, 654 (7th Cir. 1995). Because the evidence here does not rise to the standard of reckless endangerment contemplated by § 3C1.2 and reflected in these cases, the Court should not apply that enhancement here.

Equally important, the government has not produced evidence that Mr. Marshall was the driver of Mr. Davila's car on the three occasions that it cites to support this enhancement. To the contrary, the PSR indicates that Mr. Davila, the owner of the Acura, was the likely driver. *See, e.g.,* PSR ¶ 101. Nor is there evidence that Mr. Marshall, as a passenger, "aided or abetted, counseled, commanded, induced, procured, or willfully caused" any high-speed chase. *See* U.S.S.G. § 3C1.2 cmt. 5. For that additional reason, this Court should decline to impose the "reckless endangerment" enhancement to Mr. Marshall here.

Indeed, in each case relied on by the government to support its proposed application of the reckless endangerment enhancement, the defendant was the driver of the car. For example, in *Carrero-Hernandez*, 643 F.3d at 347, the defendant led the police on a high-speed chase on small back roads in the early evening in a residential neighborhood. At sentencing, a police officer testified that "the pursuit went over a large hill with obstructed sight lines" and that after the defendant abandoned the vehicle and fled on foot, the officer noticed that the area was full of pedestrians. *Id.* at 347-48. In *Vega-Rivera*, 866 F.3d at 16, police attempted to pull over the defendant for a routine traffic stop, after which he instigated a high-speed chase that ended when he crashed into another car. In the other two cases cited by the government, it was similarly uncontested that the defendant was the driver of the car and had engaged in the high-speed chase at issue. *See Jimenez*, 323 F.3d at 324 (defendant "engaged the officers in a vehicle pursuit, traveling at a high rate of speed through business and residential areas" and "placed potential motorists and pedestrians at risk"); *Velasquez*, 67 F.3d at 655 (defendant "fled the scene at a high rate of speed (one officer had to drive between sixty and seventy miles per hour to catch up) through residential neighborhoods"). Each of these cases is distinguishable from Mr. Marshall's conduct that is at issue here.

13

Nor is there a basis for the Court to impose this enhancement due to Mr. Marshall's status as a passenger in a car involved in a high-speed chase. This is so because, as the Probation Office rightly concludes, "there is insufficient evidence that [Mr. Marshall] directly participated in the reckless conduct during the flight and that he did more than just willfully participate in the getaway chase." PSR at 91.

Although the First Circuit has not directly addressed the issue, several other federal courts of appeals have concluded that the government must demonstrate more than that an individual was a passenger in a car engaged in a high-speed chase for the enhancement to apply. For example, in *United States v. McCrimon*, 788 F.3d 75, 77 (2d Cir. 2015), the defendant left the scene of a bank robbery in a getaway car that was driven by his co-defendant. When police attempted to stop the car, the driver led police on a high-speed chase, sometimes on the wrong side of the road, and hit at least one other vehicle before crashing. *Id.* Although the government submitted testimony that the defendant had verbally encouraged the chase, the district court declined to make any factual findings based on the proffered evidence and applied the enhancement, reasoning that it was sufficient that the defendant could have reasonably foreseen that his co-defendant would recklessly drive the getaway car in furtherance of the bank robbery. *Id.* On appeal, the Second Circuit vacated the sentence, concluding that reasonable foreseeability was insufficient because Application Note 5 requires "*some form of direct or active participation*" for the enhancement to apply. *Id.* at 79 (emphasis added) (quoting *United States v. Cespedes*, 663 F.3d 685, 690 (3d Cir. 2011)).

In *Cespedes*, the Third Circuit similarly reversed a district court's application of the enhancement where there was no evidence in the record demonstrating that the defendant had "aided or abetted, counseled, commanded, induced, procured, or willfully caused" his co-

14

conspirator's reckless driving as required by Application Note 5 to § 3C1.2. *Cespedes*, 663 F.3d at 690. In that case, the defendant and a co-defendant robbed a bank, while an accomplice waited outside in a getaway car. *Id.* at 687. After stealing money from the bank's cash drawer and safe, the defendant and co-defendant got in the getaway car, and the driver then "engaged police in a high speed chase through residential neighborhoods that spanned two counties." *Id.* The district court applied the reckless endangerment enhancement, reasoning that the defendant's participation in the conspiracy to rob the bank made it reasonably foreseeable that there could be a high-speed getaway. *Id.* at 690. The Third Circuit reversed, however, concluding that application of the enhancement "based solely upon a defendant's entry into a conspiracy [wa]s inadequate because it d[id] not indicate how that defendant 'aided[,] abetted, counseled, commanded, induced, procured, or willfully caused' the recklessness upon which the enhancement is predicated." *Id.*

In *United States v. Johnson*, 694 F.3d 1192, 1194 (11th Cir. 2012), the defendant participated in a drug store robbery, after which he and an accomplice jumped in a car driven by the accomplice. At that point, police had already arrived and blocked the exits to the parking lot, so the driver "ramm[ed] one of the police cars," "fled the officers' pursuit, ignoring all traffic controls and speeding," caused other cars on the road to make "evasive maneuvers to avoid being hit," and "eventually crashed into a power pole." *Id.* In overturning the district court's application of the reckless endangerment enhancement to the passenger in the car, the Eleventh Circuit concluded that the district court had failed to make a specific finding that the defendant played "any active supporting role in the recklessness of the car-flight." *Id.* at 1197; *see also United States v. Chong*, 285 F.3d 343, 344 (4th Cir. 2002) (§ 3C1.2 could not be imposed based on a co-defendant's attempt to flee the police by driving the wrong way down a one-way street

15

and wrecking the car on a median, with the defendant as a passenger, absent a determination that the defendant directly participated in the reckless flight); *United States v. Young*, 33 F.3d 31, 32–33 (9th Cir. 1994) (the district court erred in applying § 3C1.2 to two passengers who participated in an armed bank robbery where it did not make any findings that the passengers had willfully participated in the high-speed chase that followed).

Here, there is an insufficient basis to conclude that Mr. Mashall ever "aided or abetted, counseled, commanded, induced, procured, or willfully caused" a high-speed chase. For that reason, this Court should decline to impose the reckless endangerment enhancement.

**D.     A sentence of 37 months for Mr. Marshall is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.**

Of course, this Court's determination regarding the sentencing range applicable to Mr. Marshall under the United States Sentencing Guidelines does not end its inquiry here. Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in Section 3553(a)(2). The sentence must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2).

Here, Mr. Marshall contends that a sentence of 37 months, at the low end of his proposed calculation of the applicable guideline range, together with three years of supervised release tailored to address his substance use disorder, gambling addiction, and other mental health issues, is "sufficient, but not greater than necessary" to achieve the purposes of § 3553(a). Indeed, a 37-month sentence for Mr. Marshall would provide a lengthy punitive sanction that can

…

be balanced with the robust treatments that will be necessary for his rehabilitation and ultimate re-integration into society.

The offense conduct in this case is, to be sure, serious. Mr. Marshall acknowledges his wrongdoing and has taken responsibility for his actions, including by participating in an inmate-run restorative justice program at Wyatt. That acceptance of responsibility notwithstanding, Mr. Marshall's commission of these offenses is at least in part related to his struggles with substance abuse and his history of problematic gambling addiction. Those challenges, in turn, were likely brought about by his dysfunctional formative and young adult years, *see* PSR ¶ 285, as well as the significant physical and mental health struggles he has experienced after being shot, *id.* ¶ 297. Fortunately, Mr. Marshall's ready acknowledgement of his struggles and his efforts to seek out services (even if ultimately unsuccessful) indicate that he is motivated to receive the treatment he needs. *See* PSR ¶¶ 300-310. He is also fortunate to have the support of a loving community of family and friends. *See generally* Letters of Support. In sum, a consideration of Mr. Marshall's personal history and circumstances suggests that a sentence at the low end of the guideline range is reasonable and appropriate here.[4]

Whatever sentence the Court imposes upon Mr. Marshall here, his remaining period of incarceration will be more than sufficient for him to take advantage of vocational and substance abuse programs available within the Bureau of Prisons, necessary components of his effort to put his life back together again post-release. Moreover, a three-year term of supervised release with intensive monitoring of his mental health issues, substance abuse, and employment will

---

[4] The proposed 37-month sentence for Mr. Marshall is also significant enough to have a deterrent effect and to protect the community. *See* 18 U.S.C. § 3553(2). Indeed, the deterrence of future criminal conduct and protection of the community can be accomplished in part by ensuring that Mr. Marshall remains sober and receives treatment for his gambling addiction and mental health issues.

contribute directly to his rehabilitation and avoidance of recidivism. Consequently, a sentence with a greater focus on intensive supervision than incarceration would best serve the purposes of the sentencing statute in this case.

## **CONCLUSION**

Mr. Marshall recognizes and acknowledges the seriousness of his offenses, and he understands and appreciates that his actions have had consequences that have not only inflicted emotional distress and financial burdens upon the victims of his crimes but have also adversely affected the broader community in which he lives. He has separately seen the severe impact of his conduct on his family, particularly his three young children. Given his relatively young age (26 years old), Mr. Marshall remains hopeful that, with the assistance of the resources of the Bureau of Prisons during his period of incarceration and the Probation Office during his term of supervised release, there is still time for him to rebuild his life and to become a productive member of society, a good father, and a trusted and valued member of his family. A thirty-seven (37) month sentence, while difficult for him, would give him an opportunity to do just that.

For all the foregoing reasons, as well as any additional reasons that may be advanced at the sentencing hearing in this matter, Mr. Marshall respectfully requests that this Court impose a sentence of 37 months of imprisonment to be followed by a three-year period of supervised release. Mr. Marshall further requests that the Court recommend that he be admitted to a facility where he can participate in a 500-hour substance abuse treatment program. Finally, Mr. Marshall further requests that, in light of his financial condition, the Court decline to impose any fine or restitution in this matter. *See* U.S.S.G. § 5E1.2(e).

Respectfully submitted,

ZACHARY MARSHALL
By his attorneys,

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
dcloherty@clohertysteinberg.com
Alexandra Arnold (BB) #706208
aarnold@clohertysteinberg.com
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
617-481-0160

Dated: April 3, 2024

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing, on April 3, 2024.

                                               /s/ *Daniel J. Cloherty*
                                               Daniel J. Cloherty